UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAMES SCANLON,

     Plaintiff,

v.

ENTERGY NUCLEAR OPERATIONS,
INC., et al.,

     Defendants.

_____/

Case No. 1:19-cv-545

Hon. Hala Y. Jarbou

## OPINION

Plaintiff James Scanlon is suing his former employer, Entergy Nuclear Operations, Inc. and a former coworker, Nelson Crane.  Scanlon, who is overweight, claims that Crane grabbed his chest, rubbed his stomach, and stuck a wet finger in his ear multiple times a day between October 27 and 29 in 2018.  (Compl., ECF No. 1, PageID.4.)  Scanlon asserts that this misconduct amounts to sex and disability discrimination.  After he complained about Crane's behavior, he says that Entergy retaliated, and constructively terminated him.

The complaint lists ten counts, eight against Entergy and four against Crane.  Count I alleges sex discrimination by Entergy for failing to act on Crane's misconduct in violation of Title VII, 42 U.S.C. § 2000e et seq.  Count II alleges sex and weight discrimination under the Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.201 et seq., against both Defendants.  Count III asserts an Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., claim against Entergy.   Count IV alleges both Defendants violated the Michigan Persons with Disabilities Civil Rights Act (MPDCRA), Mich. Comp. Laws § 37.1101 et seq.  Counts V-VIII claim retaliation by Entergy in violation of the ADA, the MPDCRA, Title VII, and the ELCRA

respectively.  Count IX is a battery claim against Crane.  Count X asserts intentional infliction of emotional distress by Crane.

Entergy moved for summary judgment (ECF No. 33), as did Crane (ECF No. 36).  They seek dismissal of all counts against them.  Entergy's motion will be granted.  As will be explained, the Court finds that Scanlon has not properly alleged that the amount in controversy in this case exceeds $75,000.  Thus, the Court may only exercise supplemental jurisdiction over the claims against Crane, all of which are based in state law.  Because the Court will dismiss all federal claims in this action, it will not exercise supplemental jurisdiction over the claims against Crane.

## I. Jurisdiction

The Court has jurisdiction over Scanlon's federal law claims.  28 U.S.C. § 1331.  Courts may exercise diversity jurisdiction over state law claims so long as no plaintiff is a citizen of the same state as any defendant and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332. Scanlon is a citizen of Pennsylvania.  (Compl., PageID.1.)  Entergy is incorporated in Delaware and allegedly has its principal place of business in Michigan (*Id.*, PageID.2), though it appears that its actual principal place of business is Mississippi, where it maintains corporate headquarters (Crane Decl., ECF No. 34-2, PageID.302).  Crane is alleged to be a citizen of Mississippi (Compl., PageID.2), though he claims to be a citizen of Louisiana (Crane Decl., PageID.302).  In any event, there is complete diversity between parties.  However, Scanlon has not provided allegations speaking to the amount in controversy.  (*See generally* Compl.)  Therefore, the Court cannot conclude that it has diversity jurisdiction over Scanlon's state law claims.

Nevertheless, the Court may exercise supplemental jurisdiction over the state law claims. Supplemental jurisdiction may be exercised over state law claims where the court has original jurisdiction with respect to some claims and the state claims "are so related to claims in the action within . . . original jurisdiction that they form part of the same case or controversy."  28 U.S.C.

2

§ 1367(a).  Relatedness exists where "the state and federal claims . . . derive from a common nucleus of operative fact."  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).  Every claim in this case is fundamentally based on Crane's alleged harassment of Scanlon and Entergy's response to that alleged harassment.  The state law claims are thus related to the federal claims and the Court may exercise supplemental jurisdiction over them.

## II. Factual Background

### A. Prelude

Scanlon is retired.  (Scanlon Dep., ECF No. 34-1, PageID.194.)  The events leading to this lawsuit are alleged to have caused his retirement.  Scanlon worked in nuclear power between 2001 and 2018.  (*See id.*, PageID.187.)  He joined Entergy in 2016 as a Senior Refueling Project Manager.  (*Id.*, PageID.195.)  The principal function of his role was to prepare nuclear plants for "outages" that take place during refueling.  (*Id.*, PageID.198-199.)  The alleged harassment occurred in October 2018, when Scanlon was helping run an outage at Entergy's nuclear power plant in Covert, Michigan.  At that time, Scanlon was 5'8" tall and weighed approximately 260 pounds.  (*Id.*, PageID.278-279.)

Nuclear power plants are complex operations.  Refueling is a particularly delicate process.  Every eighteen months, one third of a plant's nuclear fuel is replaced.  (*Id.*, PageID.199.)  During this time, the plant's nuclear reactor must be shut down.  These periods, known as outages, last three to four weeks.  (*Id.*, PageID.199-200.)  Naturally, shutting down a nuclear reactor for nearly a month is expensive.  Delays or mishaps during refueling extend the outage period, which in turn raises the cost of the outage.  Outages make for high-stress environments and require employees to put in long hours to minimize the time the reactor is offline.  (*Id.*, PageID.202-203 ("[i]t could get pretty ugly with the management" when outages fell behind schedule).)  Scanlon's job was to ensure that an outage went off without a hitch.  Planning and executing an outage takes an

3

incredible amount of preparation and diligence.  Once an outage is complete, Scanlon says it takes "every bit of the 18 months you have" to prepare for the next one.  (*Id.*, PageID.201.)  It is in this context that Crane came to the Covert plant and allegedly harassed Scanlon.

Crane normally worked out of Entergy's corporate headquarters in Jackson, Mississippi.[1] (*Id.*, PageID.208.)  He came to the Covert plant in October 2018 to help with the outage.  (*See id.*) Crane and Scanlon had worked on outages together from time to time.  Typically, they would communicate by phone or email.  But on occasion, they worked with each other in person.  (*Id.*, PageID.213-215.)  Prior to October 2018, Scanlon and Crane had a good working relationship. (*Id.*, PageID.215, 218-219.)  Crane had even helped Scanlon keep his job.  (*Id.*, PageID.268.)

The parties present different accounts of the Scanlon-Crane relationship.  Crane says he was friends with Scanlon and that they often joked, bantered, and roughhoused with each other. (Crane Decl., PageID.303-304.)  Scanlon disagrees.  He says that they were on good terms, but not friends; they sometimes joked and bantered about certain things, like politics, but they never engaged in physical roughhousing.  (Scanlon Dep., PageID.215, 217, 219-220, 226, 235.)  Scanlon saw Crane more as a boss than as a friend.  (*Id.*, PageID.215.)

**B. October 27-29: Alleged Harassment**

Crane arrived at the Covert plant on October 27, when the outage began.  (*See id.*, PageID.203, 208.)  That same day, he approached Scanlon, grabbed him by the chest, and said "let me squeeze those big fat titties."  (*Id.*, PageID.223.)  Crane concedes that he grabbed Scanlon's chest "in jest," but denies saying "let me squeeze those big fat titties."  (Crane Answer, ECF No. 10, PageID.64.)  Scanlon tried to ignore this affront, apparently hoping that Crane would give up

---

[1] The summary judgments briefs and, from what the Court can tell, the record itself, fail to provide Crane's official title, or even give a detailed description of Crane's job.  He held what appears to be a relatively senior role at Entergy, and at least part of that role involved dealing with outages in some way.

4

if he did not react.  (Scanlon Dep., PageID.224.)  According to Scanlon, Crane said, "Look, you don't even say nothing because you like it, pussy, don't you?"  (*Id.*)  Scanlon then told Crane to stop.  Later that day, Crane rubbed Scanlon's belly.  (*Id.*, PageID.224.)  Some time after that, he wet his finger and inserted it in Scanlon's ear.  (*Id.*, PageID.226.)  Crane repeated these actions on October 28 and 29 as well, occasionally in front of other employees.  (*Id.*, PageID.230-233.)  Broadly speaking, Crane admits to doing these things, but denies making the various offensive statements alleged by Scanlon.  (*See* Crane Decl., PageID.303-304; Mosby Internal Investigation Report, ECF No. 34-3, PageID.312-314.)

Matters came to a head on the 29th.  Scanlon was waiting on a worker to arrive.  (*See* Scanlon Dep., PageID.211-212.)  The worker, Olsen, had been delayed for several days, tied up with work at an Entergy plant in Arkansas.  (*Id.*)  Securing appropriate resources for an outage could often lead to a "battle" between corporate and local plant management.  (*Id.*, PageID.206.)  Scanlon called a colleague asking where the worker was; the colleague said he was still in Arkansas.  (*Id.*, PageID.212.)  Scanlon immediately called another colleague and "scream[ed] about the guy not arriving."  (*Id.*, PageID.213.)  Through that second call, Scanlon learned that the worker's arrival would be delayed by another day, and that Crane was either aware of or even approved this decision.  (*Id.*, PageID.208.)  Scanlon texted Crane and another colleague, Bobby Joe Parker, to complain about Olsen's delay.  (*Id.*, PageID.239-240; Scanlon Texts, ECF No. 34-1, PageID.289.)  He also expressed concern that upper management would hold him responsible for any delays in the refueling process.  (*Id.*)  Scanlon stated that he would not stick around for

"retention"[2] and that he planned to retire in January 2019.  (*Id.*)  He "went home very angry" and called to "argue[] with Westinghouse."[3]

That night, Scanlon confronted Crane on the phone.  (*Id.*, PageID.207-208.)  Scanlon felt that Crane had taken corporate's side in permitting the worker to remain in Arkansas longer than scheduled.  (*Id.*, PageID.208.)  Scanlon says he also complained about Crane's physical harassment.  (*Id.*, PageID.243.)  They "ended up in an argument."  (*Id.*, PageID.208.)  Scanlon hung up on Crane.  (*Id.*, PageID.243.)  A text conversation followed.  Just shy of 9:00 PM, Crane texted Scanlon to "[p]lease call . . . if you are still awake."  (Crane Texts, ECF No. 34-1, PageID.291.)  Scanlon replied "I will not be returning," to which Crane responded "[o]k."  (*Id.*)  Scanlon says that he meant he would not call Crane back.  (Scanlon Dep., PageID.245-246.)  The text conversation does not mention Crane's alleged harassing behavior.  Some time after the argument with Crane, Scanlon texted a coworker to say that he would not be coming into work the next day.  (*Id.*, PageID.247; Crocker Decl., ECF No. 34-9, PageID.373.)

### C. October 30-November 1: Scanlon Is Absent, Under Investigation

Scanlon's absence from work on October 30 caused confusion and consternation.  According to Scanlon, some employees, such as Crane, were unaware that he would be taking off work.  (*Id.*, PageID.247.)  Scanlon's direct supervisor, Johannes "Jody" Haumersen, may or may not have been aware that he was taking the day off.  Around 10:00 AM, Crane texted Scanlon that he was "[c]hecking to make sure your [*sic*] okay."  (Crane Texts, PageID.108.)  Several other coworkers tried to contact Scanlon but did not receive a response.  (Haumersen Decl., ECF No. 34-8, PageID.363.)  Around noon, Tammy Wright, another Entergy employee, drove to Scanlon's

---

[2] Entergy offered employees a retention bonus to work through outages.

[3] Olsen was an employee for the company Westinghouse.  Entergy contracted with Westinghouse to have certain employees help with refueling at Entergy's nuclear plants.

house and managed to speak with him.  (Scanlon Dep., PageID.255.)  Scanlon says Tammy came

just to check in, though Defendants contend that she also told him to contact Haumersen.  (*Id.*;

Haumersen Decl., PageID.363.)  Darrell Corbin, the General Manager of the Covert plant, revoked

Scanlon's "unescorted access" authorization to the Covert plant "pending further review." (Corbin

Decl., ECF No. 34-4, PageID.317.)  Scanlon says Wright told him about this when she came to his

house.  (Scanlon Dep., PageID.255.)

At approximately 2:15 AM on October 31, Scanlon emailed Haumersen to say that he was

"still sick" and would "be out a little longer."  (Mahurin Email, ECF No. 34-1, PageID.295.)

Around the same time, he also emailed Steve Tillman, a human resources officer at Entergy, saying

that he wanted to "meet . . . soon."  (Scanlon Email, ECF No. 34-1, PageID.293.)  They spoke

around 12:40 PM.  (Tillman First Meeting Notes, ECF No. 34-6, PageID.336.)  Scanlon

complained about Crane's behavior.  (*Id.*)  At 5:54 PM, Kim Mahurin, an HR Manager at Entergy,

emailed Scanlon regarding his two-day absence from work and "lack of communication."

(Mahurin Email, PageID.295.)  She copied Haumersen and Corbin.  The email instructed Scanlon

to appear at a virtual meeting on November 1 with her, Haumersen, and Corbin so that his "status

can be evaluated."  (*Id.*)  Scanlon forwarded this email to Tillman, and they had a second phone

conversation.  (Tillman Second Meeting Notes, ECF No. 34-6, PageID.337.)  Tillman's

contemporaneous notes indicate that he suggested Scanlon should go to the meeting and air his

grievances, including those relating to Crane's misconduct.  (*Id.*)  Scanlon says that Tillman did

not encourage him to mention Crane's behavior.  (Scanlon Dep., PageID.257.)

Scanlon, Mahurin, Haumersen, and Corbin held their virtual meeting on November 1.

They discussed Scanlon's absences and purported lack of communication.  It is not clear exactly

what was said, but at some point it appears that someone asked Scanlon if anything was wrong.

He stated that "[t]here are things going on that you're not aware of." (*Id.*)  Mahurin asked if he "[w]ould be willing to share" what those issues were. (*Id.*)  Scanlon declined, saying he has "had private conversations with you before where my coworkers came back and questioned me about it, so on, I would not feel comfortable sharing . . . with you." (*Id.*, PageID.258.)  Scanlon did not mention Crane's misbehavior during the meeting.  Later that day, Tillman emailed Scanlon to confirm a follow-up call on the Crane issue tentatively scheduled for November 2. (11/01/2018 Tillman Email, ECF No. 34-1, PageID.297.)  Scanlon immediately replied, saying he was "just going to let it drop." (*Id.*)

### D. After November 2: Scanlon Resigns, Crane Is Investigated and Reprimanded

The record is not perfectly clear, but it appears that two things resulted from the November 1 meeting: (1) Scanlon's unescorted access authorization would remain revoked for the time being, and (2) Haumersen told Scanlon he would need to get medical clearance before he could return to work. (Scanlon Dep., PageID.269.)  Scanlon saw a doctor on November 2, and apparently his "vitals were so out of whack" that he was admitted to the hospital for observation because they were not sure whether Scanlon was suffering from anxiety or having a heart attack. (*Id.*)  He was given anxiety medication (*id.*) and on November 3 told Haumersen that he had been discharged from the hospital and was ready to return to work. (Haumersen Decl., PageID.363.)

On November 5, Corbin and Haumersen discussed Scanlon's potential return to the plant. (*Id.*, PageID.364.)  Corbin expressed concern regarding "Scanlon's suitability for unescorted access authorization" under government regulations and Entergy policy.[4]  (*Id.*, PageID.318.)

---

[4] The U.S. Nuclear Regulatory Commission requires operators of nuclear power plants "to implement and maintain an 'access authorization program' that provides 'high assurance' that employees with unescorted access to the nuclear plant 'are trustworthy and reliable[.]'" (Corbin Decl., PageID.316.)  Such an access authorization program "must include numerous elements, including background investigations, credit history evaluations, character and reputation evaluations, psychological assessments, and behavioral observation." (*Id.*, PageID.317.)

Haumersen submitted paperwork to have Scanlon evaluated by Entergy's Behavioral Observation Program.  (Haumersen Decl., PageID.364.)

On November 6, Tillman concluded that Entergy policy required him to act on Scanlon's complaint even though Scanlon had requested to drop the matter.  (Tillman Decl., ECF No. 34-6, PageID.333.)  Tillman submitted a report with Entergy's Ethics Department.  (*Id.*)  Tillman says he "did not share Mr. Scanlon's concerns with Mr. Haumersen or Mr. Corbin at any time while Mr. Scanlon was employed by Entergy."  (*Id.*, PageID.334.)  He did notify Mahurin, but only after he had submitted the report on November 6.  (*Id.*)

Waldron Mosby, an investigator in Entergy's Ethics Department, was assigned to the case.  (Mosby Decl., ECF No. 34-3, PageID.309.)   On or about November 15, Mosby interviewed Scanlon regarding his interactions with Crane.   (Mosby Internal Investigation Report, PageID.313.)  Scanlon told Mosby that, multiple times a day between October 27-29, Crane would grab his chest, rub his belly, or a stick a wet finger in his ear while making offensive and inappropriate comments.  (*Id.*)  Mosby's report also indicates that Scanlon said he and Crane used to joke around and that Crane had even previously touched him in similar ways, but that "he did not find it funny this time."   (*Id.*)   Scanlon denies saying this to Mosby.  (Scanlon Dep., PageID.273-274.)  The report states that, other than Mosby and Tillman, Scanlon had not told anyone about Crane's conduct.  (Mosby Internal Investigation Report, PageID.313.)

Around December 5, Scanlon's evaluation was completed, and he was reauthorized for unescorted access at the Covert plant.  (Haumersen Decl., PageID.364.)  Several days after that, Haumersen called Scanlon to say that he could return to work.  (*Id.*; Scanlon Dep., PageID.263.)  According to Scanlon, Haumersen warned that he would be "returning to a hostile work environment."   (Scanlon Dep., PageID.265.)   Haumersen denies making that statement.

(Haumersen Decl., PageID.364.)   Haumersen also mentioned that Crane would be at the plant. (Scanlon Dep., PageID.264.)

On December 11, Scanlon went to the plant to go through the process of restoring his access clearance.  (*Id.*, PageID.275.)   He met and spoke with Haumersen.   Haumersen says he told Scanlon that he would be scheduled for night shifts so that Haumersen could directly supervise him.  (Haumersen Decl., PageID.364.)   Crane was scheduled for day shifts, but Scanlon avers that the day and night shifts overlap somewhat.   Scanlon also says that Haumersen encouraged him to retire at this meeting.   (Scanlon Dep., PageID.266.)   He then told Haumersen about Crane's behavior for the first time.  (*Id.*, PageID.275-276.)   Haumersen denies advising Scanlon to retire, stating that Scanlon was the one who suggested it, and claims that he did not learn about Crane's misconduct until he met with Mosby the following day.  (Haumersen Decl., PageID.364-365.)

Scanlon also met with Mosby on December 11, where they discussed the Crane situation. (Mosby Internal Investigation Report, PageID.313.)   Mosby had spoken to Crane, who largely admitted to the physical conduct alleged by Scanlon.  (*Id.*)  Mosby's report states that Scanlon was "preparing to tender his resignation" to Haumersen because of "his frustration with his job and the lack of support he received for the refueling outage."  (*Id.*)  Scanlon denies this.   Scanlon also says that Mosby stated it was a tough case for him because he had been friends with Crane for 30 years.

On December 14, Scanlon emailed Haumersen to say that he was resigning "effective immediately."  (Resignation Email, ECF No. 34-1, PageID.300.)   He thanked Haumersen for his help and mentorship over the years and wished a "safe and error free operation through shut down." (*Id.*)  He did not mention Crane.   Scanlon had not officially returned to work since October 30.

On December 17, Mosby submitted his investigation report, which concluded that Scanlon's allegation of chest-grabbing was "substantiated."  (Mosby Internal Investigation Report,

10

PageID.314.)  On January 8, 2019, Crane received a written warning stemming from his behavior

towards Scanlon.  (Written Warning, ECF No. 34-2, PageID.306.)  The warning stated that Crane

"violated the Discrimination and Harassment Prevention Policy by putting your hands on another

employee and calling him an offensive name."  (*Id.*)  Further misconduct would result in

"recommendation for termination of employment."  (*Id.*)  At his deposition, Scanlon was asked

whether he "thought it was appropriate for [Entergy] to discipline [Crane] in this way"; he replied

"[y]es."  (Scanlon Dep., PageID.262.)

### III. Standard

Summary judgment is appropriate when the moving party demonstrates that "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must examine the "pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any," to determine whether there is a genuine

dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ.

P 56(c)) (internal quotations omitted).  A fact is material if it "might affect the outcome of the

suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is genuinely

disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party."  *Id.* at 249 (citing *First Nat'l Bank. of Ariz. v. City Serv. Co.*, 391 U.S. 253,

288-89 (1961)).  "Where the record taken as a whole could not lead a rational trier of fact to find

for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for

trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City

Serv.*, 391 U.S. at 289).  In considering the facts, the Court must draw all inferences in the light

most favorable to the nonmoving party.  *Id.*  However, "[t]he mere existence of a scintilla of

evidence in support of [a party's] position will be insufficient; there must be evidence on which

the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249.

## IV. Analysis

### A. Entergy's Motion for Summary Judgment

The main thrust of Entergy's motion for summary judgment is that the relevant actors responded in an appropriate and timely fashion when they respectively learned of Crane's behavior. Consequently, Entergy argues that it neither discriminated nor retaliated against Scanlon.

### 1. Count I: sex discrimination under Title VII

Scanlon argues that Crane's actions subjected him to a hostile work environment. There are five elements to a hostile work environment claim. The plaintiff must show that: (1) he was a member of a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment created a hostile work environment; and (5) the employer is liable. *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). Entergy argues that Scanlon has failed to establish the third, fourth, and fifth elements. (Entergy's Br., ECF No. 34, PageID.167.) The Court agrees that Scanlon has failed to establish the fifth element and will address that issue alone.

An employer's potential liability under Title VII partly depends on the relationship between the plaintiff and the alleged harasser. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). Employers are strictly liable when the alleged harasser is a supervisor and the harassment "culminates in a tangible employment action." *Id.* Where the alleged harasser is a coworker, not a supervisor, the "the employer is liable only if it was negligent in controlling working conditions." *Id.* When dealing with harassment by a coworker, a plaintiff establishes employer negligence by showing that the employer "knew or should have known of the charged . . . harassment and failed

to implement prompt and appropriate corrective action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009) (internal quotations omitted).

Scanlon repeatedly refers to Crane as a supervisor and claims that Crane exercised a supervisory role over his job. But that is insufficient. "Supervisor" has a distinct legal meaning in this context. Under Title VII, a person is a supervisor only if "he or she is empowered by the employer to take tangible employment actions against" the plaintiff. *Vance*, 570 U.S. at 424. Tangible employment actions include "'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Id.* at 431 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Scanlon says he viewed Crane as a superior, and that to some extent Crane could tell him how to do his job. (Scanlon Dep., PageID.277-278.) But he also acknowledged that Crane lacked the power to terminate him. (*Id.*, PageID.277 ("He could not fire me.").) The mere "ability to direct another employee's task is simply not sufficient" to make someone a supervisor. *Vance*, 570 U.S. at 439. Nothing in the record shows that Crane possessed the necessary supervisory powers over Scanlon. For the purposes of Title VII, then, Crane was Scanlon's coworker, not a supervisor.

Thus, Scanlon bears the burden of showing that Entergy "knew or should have known of the charged . . . harassment and failed to implement prompt and appropriate corrective action." *Barrett*, 556 F.3d at 516. In other words, he must show that Entergy "manifest[ed] indifference or unreasonableness in light of the facts [Entergy] knew or should have known." *Waldo v. Consumers Energy Co.*, 726 F.3d 814, 821 (6th Cir. 2013) (internal quotations omitted). "Generally, a response is adequate if it is reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999). "'[R]easonably appropriate corrective action' may include initiating an investigation to determine the factual basis of the complaint, 'speaking with

13

the specific individual identified by [the complainant], following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management.'" *Waldo*, 726 F.3d at 814 (quoting *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir. 2010)).

Scanlon cannot show an inadequate response. Key to this issue is when various people learned of the alleged harassment. Tillman was the first to learn of the issue. Scanlon emailed him on October 31, and Tillman opened a case and spoke to Scanlon about it that very same day. Scanlon did not tell Haumersen, Corbin, or Mahurin about Crane's behavior during their November 1 meeting. When Tillman contacted Scanlon after the meeting, Scanlon said he wanted to drop the matter. Tillman concluded that policy required him to pursue the issue and thus submitted a report on November 6. Mosby investigated. He spoke to Scanlon at least twice about the alleged harassment, and interviewed Crane. During the entire investigation, Scanlon was away from the Covert plant and at no risk of encountering Crane.

In his opposition brief, Scanlon contends that his absence was actually the result of "swift" retaliation – that his access to the plant was revoked by Corbin because he reported Crane's harassment. (Pl.'s Resp. to Entergy's Mot. for Summ. J., ECF No. 41, PageID.634.) This is contradicted by his own deposition testimony, where he says that his authorization was revoked – or at least in the process of being revoked – on October 30, *before* he reported Crane. In fact, Scanlon never establishes when Corbin learned about Crane's behavior.

Mahurin learned about the Crane issue after Tillman submitted his report. Again, at this time, the matter was being investigated and Scanlon was not coming into work. The alleged harassment was being adequately handled, so Mahurin was not required to do anything else.

14

Haumersen says that he learned about Crane's misconduct from Mosby on December 12, but Scanlon contends that he informed Haumersen of the issue when they met on December 11. Scanlon is the non-moving party, so the Court will accept his version of the facts as true. He claims that Haumersen warned him that he was returning to a "hostile work environment" and encouraged him to retire. But it is also undisputed that, when Scanlon came back to work, he would be on night shifts with Haumersen while Crane would work day shifts. There was apparently some overlap between shifts, but Scanlon's contention that "he would be working under Crane" is unsupported by the record. (Pl.'s Resp. to Entergy's Mot. for Summ. J., PageID.645.) Having Scanlon and Crane work separate shifts would be reasonably likely to prevent further harassment. Haumersen's ill-advised words cannot overcome his actions: for whatever reason, he made it so that Scanlon and Crane would not work together upon Scanlon's return. Moreover, an employer is not required to completely separate a plaintiff from his alleged harasser in order to escape subsequent liability. *See Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 749-50 (6th Cir. 2008) ("Title VII did not require [the employer] to ensure that [the plaintiff] and [the alleged harasser] were separated at all times.").

Scanlon also takes issue with Mosby and his alleged reluctance to punish Crane because of their friendship. But even if Mosby expressed such reservations when he met with Scanlon on December 11, Mosby's actions are dispositive. Despite his apparent bias, Mosby interviewed Scanlon, investigated Crane, substantiated Scanlon's allegations, and submitted an investigation report to that effect. He was tasked with investigating a claim of harassment, and he did so, concluding that his investigation substantiated Scanlon's claim.

Finally, in his opposition brief, Scanlon derides Crane's written warning as "tepid." (*Id.*, PageID.636.)    In his  deposition,  though,  Scanlon  agreed  that  Crane's  punishment  was

"appropriate."   (Scanlon Dep., PageID.262.)   The reprimand's admonishment that further misconduct would result in a recommendation of termination was reasonably calculated to prevent further harassment by Crane, particularly considering that Scanlon had not complained about Crane before October 2018.  (*Id.*, PageID.227; *see Swanson v. Livingston Cnty.*, 121 F. App'x 80, 84 (6th Cir. 2005) (written reprimands are adequate responses to allegations of sexual harassment).)

In sum, no reasonable jury could find that Entergy manifested indifference or unreasonableness when it learned of Crane's behavior.  The matter was investigated, Scanlon's allegations were substantiated, and Crane was disciplined.  Furthermore, Scanlon did not work with Crane after he lodged his complaint.  Entergy is entitled to summary judgment on Count I.

### 2. Count II: Sex and weight discrimination under the ELCRA

The elements of a hostile work environment claim under the ELCRA are substantially the same as its federal Title VII counterpart.  A plaintiff must prove five elements, which are that: (1) he belonged to a protected group; (2) he was subjected to communication or conduct on the basis of that protected status; (3) the status-based communication or conduct was unwelcome; (4) the unwelcome communication or conduct substantially interfered with his employment; and (5) the employer is liable.  *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 319-20 (Mich. 1996) (citing *Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993)).  Scanlon's ELCRA claim against Entergy fails for the same reason mentioned above: Crane was a coworker, not a supervisor, and the company's response was adequate.  *See Hylko v. Hemphill*, 698 F. App'x 298, 299-300 (6th Cir. 2017) (no employer liability under ELCRA for adequate response to harassment by non-supervisor).  Scanlon cannot establish the fifth element of his ELCRA claim.  The Court will grant summary judgment in favor of Entergy.

### 3. Count III: Discrimination under the ADA

Scanlon claims that in 2018 he had a disability because of his obesity or that, in the alternative, Entergy regarded him as disabled due to his weight.  His ADA claim fails under either theory.

The Sixth Circuit has held that obesity is not a disability within the meaning of the ADA unless it is the result a physiological condition.  *EEOC v. Watkins Motor Lines, Inc.*, 463 F.3d 436, 442-43 (6th Cir. 2006).  In his deposition, Scanlon opined that his long-term obesity is caused by genetic issues.  (Scanlon Dep., PageID.280.)  But he has never received a medical diagnosis connecting his weight to some physiological cause.  (*Id.*)  Scanlon has not produced any evidence that could establish that his obesity qualifies as a disability under the ADA.

His "regarded-as" theory fares no better.  "[T]o state the threshold condition of a 'regarded as' ADA claim, an employee need only show that their employer believed that they had a 'physical or mental impairment,' as the term is defined in federal regulations."  *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019).  The record here is devoid of any indication that anyone at Entergy believed that Scanlon's weight rendered him disabled or that he had some underlying condition that caused him to be obese.

In opposing summary judgment on this claim, Scanlon gives the following citation-free argument:

> Crane's behavior towards Scanlon smacks of regarded-as discrimination.  Many non-obese individuals hold negative attitudes towards the obese.  They tend to think that they are lazy or lacking in self-discipline.  This often translates into discrimination in the workplace.  Overweight people are less likely to be hired for jobs.  Crane's repeated harassment towards Scanlon demonstrates that he viewed him as less fit for work than others who were not overweight.  This strongly suggests that he believed Scanlon suffered from an impairment that affects his ability to work.

(Pl.'s Resp. to Entergy's Mot. for Summ. J., PageID.647.)

This is insufficient to survive Entergy's motion for summary judgment. Assuming that Crane's perception of Scanlon is even relevant – he made no decisions about Scanlon's work – nothing in the record even hints that Crane perceived Scanlon as disabled.

### 4. Count IV: Discrimination under the PWDCRA

"The PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.* 667 F.3d 757, 764 (6th Cir. 2012). Given that the record contains no evidence of discrimination against Scanlon for any actual or perceived disability, the Court will grant summary judgment in favor of Entergy on this claim for the same reasons given with respect to the ADA claim.

### 5. Counts V-VIII: Retaliation

Scanlon asserts retaliation under the ADA, the PWDCRA, the Title VII, and the ELCRA. Claims under each statute are analyzed according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013) (applying *McDonnell Douglas* to Title VII and ELCRA claims), *abrogated on other grounds by Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). The *McDonnell Douglas* standard has three steps. First, the plaintiff must establish a *prima facie* case of retaliation. If the plaintiff does so, the defendant-employer must "articulate some legitimate, [non-retaliatory] reason" for its action. If the employer-defendant can do so, the burden shifts back to the plaintiff, who must produce evidence showing that the reason given by the defendant-employer was merely pretextual. *McDonnell Douglas*, 411 U.S. at 803-05.

There are four elements to a *prima facie* case of retaliation. The plaintiff must show that: (1) he engaged in activity protected by the relevant statute; (2) the exercise of those rights was known to the defendant; (3) he was subjected to an adverse employment action or a "severe or pervasive" retaliatory harassment by a supervisor; and (4) "there was a causal connection between

18

the protected activity and the adverse employment action or harassment." *Fuhr*, 710 F.3d at 674. Assuming Scanlon has met the first element, he fails to satisfy the remaining three.

Scanlon argues he was subjected to three adverse actions: (1) the revocation of his security clearance; (2) the requirement to "return to work with Crane as his supervisor following the conclusion of the investigation"; and (3) Haumersen's attempt to "dissuade[] him from returning and pressure[ing] him to resign." (Pl.'s Resp. to Entergy's Mot. for Summ. J., PageID.650.)

The first purported adverse action fails to make a *prima facie* case because Scanlon's access authorization was revoked by Corbin and the record does not establish when, if ever, Corbin learned about Scanlon's reporting on Crane. Scanlon cannot show that Corbin knew of his exercise of rights, and thus also fails to demonstrate a causal connection between making a complaint against Crane and the revocation of his security clearance.

Likewise, Scanlon's second claimed adverse action is not supported by the record. Haumersen stated that Scanlon would return by working night shifts, supervised by Haumersen, while Crane would work day shifts. (Haumersen Decl., PageID.364.) Nothing in the record contradicts Haumersen's assertion. Scanlon has therefore failed to show that this adverse action actually occurred.

Finally, Haumersen's purported warnings about a "hostile work environment" and suggestion that Scanlon retire rather than return to work do not rise to the level of adverse employment actions. He correctly points out that adverse actions are defined more broadly in the retaliation context than in the discrimination context. *See Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569 (6th Cir. 2019) ("[T]he requirements for a retaliation claim are in fact considerably less stringent."). Instead of demonstrating that the challenged action "'affect[ed] the terms and conditions of employment," Scanlon "need only show 'that a reasonable employee would have

19

found the challenged action materially adverse, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, 68 (2006)).

Haumersen's statements still fall short.  As an initial matter, the challenged actions normally must go beyond words.  *See, e.g. White*, 548 U.S. at 70-71 (retaliation where employee's duties reassigned to include higher percentage of "arduous" tasks); *Hubbell*, 933 F.3d at 570 (nonstop supervision paired with constant write-ups for minor infractions was retaliation); *Mys v. Mich. Dep't of State Police*, 590 F. App'x 471, 480-81 (6th Cir. 2014) (improper and involuntary transfer to different police department was retaliation).  Being repeatedly told to quit, however, does not rise to the level of an adverse action.  *Siegner v. Twp. of Salem*, 654 F. App'x 223, 227 (6th Cir. 2016).  The court in *Siegner* also noted that "[c]onsultation between a supervisor and an employee, even when it involves a 'confrontation . . . in which harsh words were exchanged,' is not a materially adverse action." *Id.* at 231 (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir. 2007)).  Title VII "does not set forth 'a general civility code for the American workplace.'" *White*, 548 U.S. at 68 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)).

Adverse actions are context-specific when it comes to retaliation.  And surely an unending barrage of negative statements, without more, could sometimes qualify as retaliation. Haumersen's admonishments do not rise to that level.  His words may have been ill-advised, but their isolated nature – Haumersen suggested retirement just once, and is alleged to have commented on the "hostile work environment" on two occasions – precludes a finding of adverse action.  Scanlon has not made a *prima facie* case of retaliation by Entergy.  The Court will grant summary judgment on Counts V-VIII.

**B. Crane's Motion for Summary Judgment**

Scanlon brings only state law claims against Crane: sex and weight discrimination under the ELCRA (Count II), disability discrimination under the PWDCRA (Count IV), battery (Count IX), and intentional infliction of emotional distress (Count X).

"Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 551 U.S. 375, 377 (1994). This notion is especially salient when deciding whether to exercise supplemental jurisdiction over state law claims. While federal courts may exercise supplemental jurisdiction even after all federal claims are dismissed before trial, "the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Only "'overwhelming interests in judicial economy may allow a district court to properly exercise its discretion and decide a pendent state claim . . . [where] the federal claim has been dismissed before trial.'" *Kubala v. Smith*, 984 F.3d 1132, 1138 (6th Cir. 2021) (quoting *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991)).

The Court has determined that Entergy will prevail for reasons that do not relate to the case against Crane. Entergy adequately responded to the alleged harassment – that has no bearing on whether Crane's behavior in fact created a hostile work environment or whether he acted out of animus towards Scanlon's sex or perceived disability. The Court does not find the interests in judicial economy outweigh the general principle that federal courts should not exercise supplemental jurisdiction when all federal claims have been dismissed. Accordingly, the Court will dismiss the claims against Crane.

**V. Conclusion**

For the reasons stated, the Court will grant Entergy's motion for summary judgment.  The Court will decline to exercise supplemental jurisdiction over the claims against Crane, which are all based in state law.  An order will enter consistent with this opinion.


Dated:   March 1, 2021                                    /s/ Hala Y. Jarbou
                                                          HALA Y. JARBOU
                                                          UNITED STATES DISTRICT JUDGE